UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORENZO PORTER LOTT,

                Plaintiff,

                                      Case No. 09-CV-14382

vs.

                                        HON. GEORGE CARAM STEEH

ICS MERRILL,

                Defendant.

_____/

ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DOC. 26]

On November 6, 2009, plaintiff Lorenzo Porter Lott filed a complaint alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 against his former employer, defendant ICS Merrill ("ICSM"). This matter is before the court on defendant's motion for summary judgment. Oral argument was had before the court on April 20, 2011. For the reasons stated below, defendant's motion for summary judgment is GRANTED.

FACTUAL BACKGROUND

Defendant ICSM is the investigation division of Examination Management Services, Inc., which provides a full spectrum of medical information, risk management and investigation services to insurance companies, business entities and legal service providers. Defendant specializes in investigating insurance claims and provides comprehensive claims investigations.

Plaintiff Lorenzo Porter Lott is an African American man who was hired to work as a field investigator in Detroit, Michigan, on July 6, 2006. As a field investigator,

plaintiff was responsible for conducting video surveillance for his assigned cases. Investigators typically obtain video footage by parking outside a subject's home and recording them.  Investigators are required to submit written reports on the surveillance activity within 24 hours of completing the case, and to submit any surveillance videos within 48-72 hours after completing the assignment.

Plaintiff was assigned to defendant's Michigan office and his initial case manager was Scott Halpin.  In March 2008, Jason Gay became plaintiff's case manager.  In October 2007, Chatoya Shelton, an African American woman, became plaintiff's regional manager.  Ms. Shelton was responsible for the management and supervision of the Michigan investigative team, and was responsible for all decisions and recommendations regarding plaintiff's employment.  (Shelton affidavit, ¶ 5).

Plaintiff worked out of his home, and communicated with Shelton, Halpin and Gay via e-mail and phone.  Neither Shelton nor Gay ever met with plaintiff in person. (Lott dep., 136-37).  Defendant tracked its investigators' productivity by calculating their video percentages - the number of cases where the investigator successfully captures the subject on video as compared to the total number of surveillance cases assigned to the investigator.  (Shelton affidavit, ¶ 14).  According to defendant, all investigators were required to maintain minimum video percentage of at least 55%.  (Shelton affidavit, ¶ 15).  It is unclear when, if ever, this requirement was communicated to the investigators. Plaintiff denies Shelton's declaration that all investigators were advised of the minimum requirement, but offers no proof from other witnesses to support his claim.

According to defendant, in November 2007, plaintiff advised management that he needed to limit his assignments to cases that were within the immediate Detroit area.

2

The reason for this limitation was that due to mechanical problems with his car, plaintiff had to share a vehicle with his girlfriend.  (Shelton affidavit, ¶ 7-8).  As a result, plaintiff was given fewer surveillance assignments during the end of 2007 and beginning of 2008.  (Shelton affidavit, ¶ 9-10).  When confronted with the issue of his transportation problem limiting his ability to take certain assignments at his deposition, plaintiff answered, "I don't remember that."  (Lott dep. 173).  Plaintiff testified that his primary vehicle was a 1997 GMC Safari van.  (Lott dep. 166).  In the Fall of 2007, the van's fuel pump broke, rendering it disabled.  (Lott dep. 167-68).  Plaintiff testified he could not afford to replace the fuel pump and never fixed the van.  (Lott dep. 168).  Plaintiff explained that he and his girlfriend, Linda, shared the use of her 1997 Sunfire or borrowed Linda's father's car.  (Lott dep. 169-70).

Defendant submits that plaintiff began a pattern of failing to submit reports and videos when they were due.  From November 2007 through March 2008, corporate trainer Jason Hunt reminded plaintiff on several occasions via e-mail when his reports and videos were late. On March 7, 2008, Shelton issued plaintiff a "verbal" counseling (in writing) for failing to timely submit case reports.

After issuing the warning, Shelton determined that plaintiff had a video average of 8%, which was the second lowest in the company.  (Shelton affidavit, ¶ 16).  On March 17, 2008, Shelton informed plaintiff of his unacceptable performance and further advised that, as a consequence of this conduct, as well as his earlier failure to timely report on his surveillance assignments, he was being placed on 90 day probation. (Exhibit F; Shelton affidavit, ¶ 17).

3

Over the next two months, plaintiff's video percentage rose to only 20%.  On May 12, 2008, Shelton made the decision to terminate plaintiff's employment.

Plaintiff's claims of discrimination focus on the allegation that he did not receive his 90 day pay raise, or his annual pay raise, while similarly situated white male investigators did receive their raises.  As a result, plaintiff voiced his concerns over disparate treatment to members of his management team.  When Ms. Shelton became his supervisor, defendant's discriminatory practices escalated.  Plaintiff alleges that his hours were cut starting in November 2007, while white male investigators did not have their hours cut.  Plaintiff also alleges that he was given twelve cases known as "no movements" in order to lower his video percentage, thus supporting a pretext that he was a poor performer.  According to plaintiff, no white investigators were assigned "no movement" cases.  However, he offers no evidence of such, nor any factual basis to conclude that he was in a position to know about the assignments made to other investigators.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored

4

procedural shortcut.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); see also Cox
v. Kentucky Dept. of Transp., 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is
"'whether the evidence presents a sufficient disagreement to require submission to a
jury or whether it is so one-sided that one party must prevail as a matter of law.'"
Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir.
2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The
evidence and all reasonable inferences must be construed in the light most favorable to
the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.
574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of
some alleged factual dispute between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that there be no genuine
issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)
(emphasis in original); see also National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d
900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there
is no genuine issue of material fact and that it is entitled to judgment as a matter of law,
the opposing party must come forward with "specific facts showing that there is a
genuine issue for trial."  First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968);
see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).  Mere
allegations or denials in the non-movant's pleadings will not meet this burden, nor will a
mere scintilla of evidence supporting the non-moving party.  Anderson, 477 U.S. at 248,

5

252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant.  McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

ANALYSIS

I.  Title VII Race Discrimination

Title VII makes it an unlawful employment practice "to . . . discriminate against or . . . discharge any individual . . . because of such individual's race [or] color . . . ."  42 U.S.C. § 2000e-2(a)(1).  The critical element in establishing wrongful discrimination in violation of Title VII is discriminatory intent.  See, St. Mary's honor Ctr. v. Hicks, 509 U.S. 502 (1993).

Plaintiff maintains that he was a victim of disparate treatment, that he was treated differently than similarly situated white employees.  Specifically, plaintiff contends that he was entitled to additional wage increases, that his caseload was reduced, and that he was ultimately discharged, all because of his race.  In addition, plaintiff claims he was retaliated against in violation of Title VII, for reporting discrimination.  42 U.S.C. § 2000e3(a).

Plaintiff fails to establish a prima facie case of race discrimination.  Plaintiff attributes the discriminatory animus to his supervisor, Chatoya Shelton, who allegedly cut his hours and terminated his employment.  Shelton is also African American, so the fact that plaintiff and Shelton are the same race raises an inference that there was no discrimination.  See Brown v. CSC Logic, Inc., 882 F.3d 651, 658 (5th Cir. 1996).  Ms. Shelton also approved a pay raise for plaintiff in October of 2007 (Ex. L), raising a "same actor inference" as well.

6

A.  <u>Prima Facie Case</u>

When an employee presents only circumstantial evidence that his discharge was motivated by race, Title VII discrimination claims are examined under the evidentiary framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Plaintiff bears the burden of persuasion in establishing a prima facie case of discrimination by showing that (1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was either replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees.  <u>Russell v. Univ. of Toledo</u>, 537 F.3d 596, 604 (6th Cir. 2004).  The dispute in this case centers on whether plaintiff was qualified for the position and whether he was treated differently than similarly situated white employees.

1.  <u>Qualified For Job</u>

To demonstrate that he was qualified for the position, plaintiff submits his resume and proffers his sixteen years of experience as an investigator and with the military.  In this case it is not disputed that plaintiff was qualified for his position when he was hired. There is at least some evidence to demonstrate that plaintiff may have subsequently become unqualified because of his low video percentage and late reports.  However, the facts are not developed well enough to conclude this issue with certainty.

2.  <u>Similarly Situated</u>

To establish that a non-protected employee is an appropriate comparable, "the plaintiff [must] demonstrate that he or she is similarly-situated to the non-protected employee in all relevant respects."  <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154

F.3d 344, 353 (6th Cir. 1998).  In the disciplinary context, courts have held that this requires that the plaintiff and the proposed comparator have engaged in acts of "comparable seriousness."  Clayton v. Meijer, Inc., 281 F.3d 605, 611 (6th Cir. 2002).  To make this assessment, the courts have looked to certain factors, such as whether the individuals "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Ercegovich, 154 F.3d at 352 (citation omitted).

When asked who was a similarly situated white employee who was treated differently than plaintiff, plaintiff testified "That would be all of the other Merrill employees in the State of Michigan.  I was the only African-American to the best of my knowledge."  (Lott dep. 314).  When asked if he knew of any other Michigan investigators who restricted the areas they were willing to travel to, were reprimanded for late reporting, who had a lower video percentage, or who were reprimanded for deficient video percentages, plaintiff answered, "I don't know."  (Lott dep. 314-15).

Plaintiff has not identified *any* white employees who were similarly situated to him, either by name or other distinguishing factor.  It is not enough for plaintiff to declare generally that all other investigators in Michigan were treated better than plaintiff, without any specifics and without any reason to conclude that plaintiff has any knowledge of how other investigators were treated in relevant respects.  If plaintiff had identified a specific employee, the court would have to determine whether that other employee was similarly situated to plaintiff.  The court would consider factors such as whether Ms. Shelton was the other employee's supervisor, and would look at the other

8

employee's video percentage, their timeliness of turning in reports, their assignment of so-called "no movement" cases, and whether they had any limitations on the type of cases they could be assigned.

However, the court cannot engage in this analysis because no other employee has been identified in this case. Nor has plaintiff alleged that he was replaced by a person outside the protected class. Because he has absolutely failed to demonstrate that he was treated differently than any similarly situated non-protected employee at defendant company, plaintiff has failed to state a prima facie case of racial discrimination.

II. Retaliation

A plaintiff has the initial burden to establish a prima facie case of retaliation by showing that (1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000).

Plaintiff complained to defendants after he did not receive a raise following his initial 90-day probationary period or at his one year anniversary. However, plaintiff admits that his complaint did not make any charge of race discrimination. (Lott deposition, 112-15). In September 2007, plaintiff sent a letter to defendant's Human Resources Department entitled "Confidence in Leadership and Promises." Plaintiff complained that he did not receive a wage increase after his first 90 days or at his one

9

year anniversary.  However, plaintiff did not claim that the reason for these events was racial animus.  (Exhibit M).

The court finds that plaintiff did not engage in any activity protected by Title VII, and therefore has no claim for retaliation.

<u>CONCLUSION</u>

For the reasons stated in this opinion, defendant's motion for summary judgment is GRANTED in its entirety.


Dated:  April 27, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on April 27, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk

---